UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION WAREHOUSE WORKERS LOCAL 1504-8, BY AND THROUGH ITS PRESIDENT, CALVIN W. WATKINS AND EXECUTIVE VICE PRESIDENT WILLIAM STROTHER AND INDIVIDUAL PLAINTIFFS DAVID L. MCBETH III, LEO WAIRE, JOHN RHOADS, VIRGIL SMITH IV, ROBERT L. ARMSTRONG, CHARLIE J. ALLUMS II, RODNEY PRIESTLY, CALVIN W. WATKINS, AND WILLIAM STROTHER, INDIVIDUALLY, <br><br>Plaintiffs, <br><br>v. <br><br>SOUTH ATLANTIC & GULF COAST INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, <br><br>Defendant. | § § § § § § § § § § § § § § § § § § § § § § § § § § § <br><br>CIVIL ACTION NO. 3:07-cv-00494 |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2) pursuant to Federal Rules of Civil Procedure 65(a). A two-day evidentiary hearing was held on January 16-17, 2008, at which both sides presented documentary and testimonial evidence. At the end of the hearing, the Court invited both sides to submit supplemental briefs; Defendant submitted a brief (Doc. No. 26), Plaintiffs did not. Having considered the evidence, arguments, and relevant law relating to Plaintiffs' request for a preliminary injunction, the Court finds that Plaintiffs' Motion should be denied for the reasons stated herein.

I.  **BACKGROUND**

This case arises out of a conflict between Defendant South Atlantic & Gulf Coast International Longshoremen's Association, AFL-CIO ("the District"), and the members of one of its local chapters in Galveston, Texas, International Longshoremen's Association Warehouse Workers Local 1504-8 ("Local 1504-8" or "the Local"). The gravamen of Plaintiffs' complaint is that the District's actions in dividing union work in Galveston, and in creating and enforcing the rules of such division, have resulted in the Local's members missing out on employment opportunities that are rightfully theirs. The Local, whose membership is predominantly African-American, further alleges that the District's actions are motivated by racial animus.

The testimony offered at the hearing by Local 1504-8 suggested that the District's alleged mistreatment of Local 1504-8 has a long and complicated history. The Local's chief complaints, however, fall into three categories. First, the Local argues that the District breached various statutory and contractual duties when it instituted the so-called "24-hour rule" in the mid-1990's.[1] This "rule" holds that, when cargo being loaded or unloaded from a vessel comes to rest for a period of twenty-four hours or more during the loading or unloading process, such cargo is "warehoused" and all union work from that point on should be assigned to Local 1504-8, the warehouse local. If the cargo comes to rest for less than twenty-four hours, the "rule" dictates that the cargo is not "warehoused," and the work of loading and unloading it is properly assigned to Local 20, the International Longshoremen's Association local in Galveston with jurisdiction over "deep sea" work. Local 1504-8 argues that this "rule" is not a rule at all, but instead a tool that intentionally divests the Local of its proper work jurisdiction. Contrary to the "rule," the Local's position is that cargo is "warehoused" as soon as it comes to rest, even if that

---

[1] It should be noted that this terminology is the District's, and that Local 1504-8 disputes that any such rule exists. The Court refers to the practice in question as the "24-hour rule" for convenience only. This Order should not be understood to find that any such "rule" exists independent of the undisputed past practices of the parties.

period of rest is less than twenty-four hours. It is undisputed that the "rule" has been in effect for many years, since at least the mid-1990's.

Second, Local 1504-8 complains that it has been excluded from all work at one of the warehouses in Galveston, a fruit warehouse serving the Del Monte Foods Company. The Local's position is that, by virtue of the existence of a warehouse, the work at the fruit warehouse is within their exclusive jurisdiction as the warehouse local. The District argues in response that, although the work takes place in a warehouse, it is properly classified as fruit work and therefore falls within the jurisdiction of the local traditionally responsible for all work in Galveston having to do with fruit. The merits of these two competing claims are hotly disputed, but both parties agree that the decision to classify the Del Monte work as falling outside Local 1504-8's jurisdiction happened more than a decade ago.

Third, Local 1504-8 argues that it has improperly been denied work assignments relating to the "stripping and stuffing" of containers in the Port of Galveston. This kind of work had traditionally been treated as part of Local 1504-8's jurisdiction, according to the Local, but was eventually reassigned to Local 20. As with the fruit warehouse work, the District does not dispute that the work has been assigned to another local, it instead argues that the work is not properly within Local 1504-8's jurisdiction. While the evidence offered at the hearing was less than definitive about when the reassignment of stripping and stuffing work to Local 20 occurred, it is undisputed that this jurisdictional classification has been in effect for at least five years.

Fourth, the Local argues that it was improperly excluded from any significant work at Galveston's cruise terminal, which was built approximately eight years ago and which has been perhaps the single most important source of longshoremen work in Galveston since its opening. The Local claims that the District failed to secure work for them when the District negotiated the

union contract covering work at the terminal in the late 1990's. The Local also argues that the District's application of the "24-hour rule" has had particularly severe results at the cruise terminal, as the loading and unloading of the cruise ships often involves bringing passenger bags and other cargo to rest for less than twenty-four hours. It is undisputed that the Local has received none or almost none of this work since the cruise terminal opened.

Importantly, the Local alleges that all of these acts by the District are motivated by racial animus towards the Local, which has historically been comprised of African-American members and which has always been perceived as a predominantly African-American organization.

Any court, and especially one whose jurisdiction was once part of the Confederacy, turns to the subject of race with humility. The history of racial oppression of African-Americans is the ugliest and most indelible stain on America's honor. That the oppression was often vigorously supported and enforced by the judiciary is both irrefutable and horrific beyond any telling of it.

Nor does the Court doubt, or wish to be seen as diminishing, the economic privations that have been visited upon Local 1504-8 and its members. It is undisputed that the Port of Galveston has undergone a radical shift in recent decades, severely restricting the employment opportunities available to a warehouse worker. Shippers increasingly prefer "just in time" delivery of cargo to warehousing their goods at the port. The Port of Houston has provided stiff competition for what warehouse work has survived. Unlike a decade ago, the cruise terminal is now responsible for a very significant portion of the union work available at the Port of Galveston today. In light of these recent changes, to exclude the Local from all union work involving cargo that comes to rest for less than twenty-four hours, and especially to exclude it from substantially all work at the cruise terminal, is to exclude it from the lion's share of the union work available in Galveston. The Court recognizes that the members of Local 1504-8

have endured many hardships of both a personal and professional nature, and that they feel especially aggrieved. The Court further notes that the matters at issue in this case have driven a wedge into the union community of Galveston, a decidedly unfortunate result that has caused much distress to all parties to this lawsuit. It is with those background considerations in mind, that the Court considers the Local's request for a preliminary injunction.

## II. ANALYSIS

### A. Legal Standards

"A preliminary injunction requires that 'the applicant ... show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)). Although the grant or denial of a preliminary injunction rests in the discretion of the trial court, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940), "[w]e have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements," *Lake Charles Diesel*, 328 F.3d at 196 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

B.  **The Four Requirements for a Preliminary Injunction**

1.  **The Likelihood of Success on the Merits**

Based on the evidence and legal argument adduced to date, the Court must conclude that the Local's claims are not substantially likely to succeed on the merits. Under Fifth Circuit precedent, this conclusion alone provides sufficient grounds to deny Plaintiffs' Motion. *See Lake Charles Diesel*, 328 F.3d at 196 (requiring the plaintiff to carry the burden of persuasion "on all four requirements"); *see also Ponce*, 508 F.3d at 768 (vacating the district court's preliminary injunction, stating, "Our analysis begins—and ends—with the first requirement.").

The first defect in the Local's claims is that those claims relating to a breach of the District's duty of fair representation are untimely. The statute of limitations for claims of a breach of a union's duty of fair representation is the six month time limit set forth in § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). *DelCostello v. Intern'l Brotherhood of Teamsters*, 462 U.S. 151, 169-71, (1983); *Lee v. Cytec Industries, Inc.*, 460 F.3d 673, 676 (5th Cir. 2006). As explained above, no one has yet denied that each alleged breach of a duty of fair representation occurred, and that the Local actually knew of each breach, more than six months ago;[2] in truth, many years ago. Because such claims accrued when the Local knew or should have known of the District's breach of its rights under a collective bargaining agreement or otherwise, *see Lee*, 460 F.3d at 675, the Court concludes that the Local's claims appear to be untimely and therefore have very little chance of success on the merits. This conclusion weighs heavily against issuing a preliminary injunction.

---

[2] The only exception is the Local's claim that it is currently being excluded from certain ongoing negotiations in Galveston. During the hearing held on January 16-17, 2008, however, the District stated that the negotiations in question are still underway and that the Local will be given the opportunity to participate as soon as possible. The Local accepted this compromise. Any claims of a breach of the duty of fair representation arising out of these negotiations are therefore no longer properly before the Court, as they are either moot because settled, or unripe because the alleged exclusion has not yet taken place.

The second defect in the Local's Motion is that its claims for race discrimination under 42 U.S.C. § 1981 are not supported by sufficient evidence of racial animus. No proof need be tendered that the history of longshoremen's unions in Galveston is one sadly replete with overt race discrimination, and the Court is willing to assume – expressly without deciding – that not all remnants of that legacy of shame have been extirpated. Whether correctly or not, however, the law makes clear that discrimination, without more, cannot sustain a claim under § 1981. Instead, liability may only be imposed under § 1981 for race discrimination when there is proof of *intentional* discrimination *by the defendant*. See *General Bldg. Contractors Ass'n v. Pennsylvania United Eng'rs and Constructors, Inc.*, 458 U.S. 375, 391 (1982) ("We conclude . . . that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination."); *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 714 (1994) ("[E]vidence that [the defendant] has *intentionally* discriminated against [the plaintiff] . . . is an essential element of a claim for relief under section 1981.").

In this case, the evidence establishes a pattern of conduct that has consistently disfavored the Local. No one disputes that the District imposed the "24-hour rule" at a time when the Local was among the largest locals in Galveston. This seemingly arbitrary decision had a predictably devastating effect on the predominantly African-American members. The decision also directly contradicts one of the District's professed nondiscriminatory reasons for its behavior towards the Local, namely, that the District has a strong preference for larger locals over smaller. Similarly, the District failed to defend the Local's interest in obtaining work at the cruise terminal, the importance of which was apparent to all longshoremen at the time. Most recently, the District allowed the smaller "clerks and checkers" local to participate in collective bargaining negotiations before allowing the larger Local 1504-8 to do the same, which breaks from the

District's usual protocol of allowing the locals to participate in order of their size. This pattern of conduct at least suggests that the District has engaged in intentional race discrimination against the Local.

In response, the District offers a series of nondiscriminatory explanations for some of its alleged actions. Those explanations include its professed dislike for the continued existence of small, independent locals, and its desire to avoid jurisdictional rules that force employers to hire two locals where one local would suffice. The District also emphasizes the other, circumstantial evidence that at least suggests that it lacks the requisite intent to discriminate, including the racial diversity of the District's own employees and the District's responsiveness in resolving at least some of Local 1508-4's recent disputes with direct employers in Galveston.

Whether the Local or the District is more persuasive on the question of intentional discrimination is ultimately for the jury to decide by a preponderance of the evidence. At this stage of the litigation, the Court's discretion is more circumscribed: before entering the requested injunction, the Court must find that the Local has "*clearly* carried the burden of persuasion on all four requirements," *Lake Charles Diesel*, 328 F.3d at 196 (emphasis added; quotations omitted), one of which is for the Local to show "a *substantial* likelihood that [it] will prevail on the merits," *Ponce*, 508 F.3d at 768 (emphasis added; quotations omitted). The question of intentional discrimination is a close one, too close to merit the extraordinary relief sought today. The Local has not clearly carried its burden of showing a substantial likelihood that it will prevail on the merits.

### 2. The Other Three Factors

The other three factors the Court must consider before issuing a preliminary injunction also counsel against granting the Local's Motion, especially in light of the fact that the Local

bears the burden of persuasion. As to the second factor, it is not clear that the harm caused by the District's actions towards the Local is irreparable. According to its own testimony, the Local has endured the District's actions for many years, a fact that can weigh against a finding of irreparable harm. *See* 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Moreover, the evidence so far does not sufficiently support a finding of intentional race discrimination, and the Court is not convinced, as it must be, that the harm resulting from the alleged breaches of the District's duty of fair representation goes beyond economic harm that could be compensated by money damages. *See Allied Mktg. Group v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (citing *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir.1983)); *see also* 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995).

As to the third factor, the Court cannot conclude that the threatened injury to the Local of not granting the requested injunction will clearly outweigh the threatened injury to the District of granting it. As already discussed, if no injunction issues, the harm to the Local will be no greater than the harm it has already endured for nearly a decade. While the Court is mindful of the difficulties the Local has encountered over that time, its delay in coming to court at least suggests that the harms it has suffered are not of the kind that require immediate and extraordinary relief. In contrast, granting the requested injunction is likely to cause severe friction in the District's relationships with the other locals and with the direct employers of Galveston's longshoremen, thereby compromising the District's ability to arbitrate between and negotiate on behalf of its locals. Admittedly, the extent of each of these sets of harm remains

unclear, but based on the evidence produced so far, the Court is unable to make a confident inference in favor of the Local when balancing the hardships of the proposed injunction. As such, this factor weighs against granting the Local's Motion.

As to the final factor, granting the preliminary injunction may well disserve the public interest. While the Court firmly believes that federal courts enjoy broad discretion to craft equitable relief, particularly when such relief is necessary to curtail intentional racism, the Court is reluctant to exercise its injunctive power to resolve what amount to daily – if not hourly – disputes over internal divisions of labor at a longshoremen's union. This reluctance is all the stronger in light of the fact that many of the parties who would necessarily be affected by such an exercise of power are not before the Court, most significantly Local 20 and the direct employers of Galveston's longshoremen. Given these considerations, the Court believes, on the state of the evidence to date, that this factor counsels against granting the preliminary injunction.

### III. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2) is **DENIED**.

**IT IS SO ORDERED.**

SIGNED this 26th day of February, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT